UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER   14-0144-01** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **JAMES PHILLIPS**<br>**a/k/a KALEEM MUSTAFAA** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 55] filed by defendant, James Phillips.  For reasons stated below, it is recommended that the motion be DENIED.

## Background

On the evening of Friday, August 16, 2013, law enforcement officers from Oak Grove, Louisiana were on the lookout for a "Freightliner Semi Truck" and a Timpte grain trailer which had been reported stolen from Tallulah and Delhi, Louisiana, respectively.  Their efforts were rewarded when they spotted and stopped the vehicles and their driver, James Phillips a/k/a Mustafaa Kaleem.  West Carroll Parish Sheriff deputies took Phillips into custody and transported him to the West Carroll Parish Sheriff Criminal Intelligence Division Building.  After executing a West Carroll Sheriff's Office Statement of Miranda Rights form, Phillips admitted that he had stolen the truck.  He also stated that he had a lot more information that he wished to discuss, but only if the FBI were present.  Accordingly, the local law enforcement officers suspended the questioning for the evening.

The next day, Special Agent William Chesser arrived on scene and proceeded to question Phillips on seven out of the next ten days.  During these sessions, Phillips made incriminating

statements. On Tuesday, August 20, 2013, Allen Irby, Assistant Chief of the Oak Grove Police Department, applied for, and obtained an arrest warrant for Phillips on a state charge of illegal possession of stolen things worth more than $5,000. On Monday and/or Tuesday August 26-27, 2013, a state court judge notified Phillips of the charge against him and appointed counsel to represent him on that charge.

Almost one year later, on July 23, 2014, a federal grand jury returned a six count indictment against James Phillips a/k/a Kaleem Mustafaa charging him and two others with a conspiracy to traffic in motor vehicles and property, along with five specific thefts, that resulted in the loss of approximately $800,000 worth of vehicles and property in violation of 18 U.S.C. §§ 371, 2312, and/or 2314. *See* Indictment.

On July 29, 2014, pursuant to court order, the Clerk of Court for the U.S. District Court for the Western District of Louisiana issued an arrest warrant for Phillips on the federal charges. [doc. #s 7-8]. On July 30, 2014, Special Agent Chesser executed the warrant by delivering it to the West Carroll Parish Sheriff, in whose custody Phillips still resided. [doc. # 16]. The government also applied for, and obtained a writ of habeas corpus ad prosequendum to secure Phillips for his August 5, 2014, initial appearance and arraignment before the undersigned. [doc. #s 11-14, 25].

On December 19, 2014, Phillips, via counsel, filed the instant motion to suppress all statements and associated evidence obtained by the government in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution. Following delays for a March 25, 2015, hearing and submission of post-hearing memoranda, the matter is now before the court.

**Relevant Testimony and Documentary Evidence**

Twelve witnesses, including defendant, testified at the hearing. The government called

2

one witness, Kenneth Green, Chief Criminal Deputy, West Carroll Parish Sheriff.  Of the ten witnesses called by defendant (not including himself), five were local law enforcement officers, three were fellow inmates from the West Carroll Parish Jail, one was his court-appointed attorney on the state charge(s), and another was his girlfriend, Delia Sanchez.[1]  The government introduced eleven of the thirteen exhibits that were accepted into evidence.

The court summarizes relevant testimony and evidence, as follows,

1. On the evening of Friday, August 16, 2013, officers with the Oak Grove Police Department and/or the West Carroll Parish Sheriff's Office arrested James Phillips on a charge of possession of a stolen vehicle.[2]  The officers transported Phillips directly to the West Carroll Parish Sheriff Criminal Intelligence Division ("CID") Building, which is located in the City of Oak Grove directly across the street from the parish courthouse and jail.

2. At 11:41 p.m. on August 16, 2013, Phillips executed the West Carroll Sheriff's Office Statement of Miranda Rights form.  (Gov.'t Exh. 1).  The form advised Phillips of his *Miranda* rights, and included a clause waiving those rights.

3. After Phillips executed the form, he voluntarily agreed to talk to the officers.  He told them that he had stolen the truck and that he had a lot more information that he wished to discuss, but only if the FBI were present.  Accordingly, Deputies Green and Walker suspended further questioning.  Jerry Philley, *the* West Carroll Parish Sheriff, telephoned Special Agent Chesser who stated that he would come over.  At that point, at least from Philley's perspective, Agent Chesser became the lead investigator.  Chesser arrived at Oak Grove the next day.

4. Phillips testified that he told Deputy Garland Walker that he had been headed to Mississippi with the truck and trailer.  Deputy Walker then advised Phillips that, if true, then Phillips had committed a federal offense.  Phillips replied, "yeah, I done federal time before."  Walker remarked that doing federal time was better than state time.  Phillips agreed.  Walker then asked Phillips if he wanted the officers to call the FBI.  Phillips replied, "yes, call the FBI."

---

[1] Special Agent Chesser did not testify at the hearing.

[2] Allen Irby, who during the period at issue was a member of the Oak Grove Police Department with approximately twelve years of law enforcement experience, was present at the scene of Phillips' August 16, 2013, arrest.  Irby prepared an arrest report, which was not introduced into evidence.

5. According to Phillips, Deputy Walker, who (like Phillips) is African-American, told Phillips that Oak Grove was a "good ol' boy town," and that things were not going to go favorably for an African-American. Walker explained to Phillips that he could help him out if Phillips would work with him. In fact, Phillips stated that Walker admitted to him that the other officers had sent him to talk to him because both of them were African-American.

6. Phillips testified that Deputy Walker asked him whether he was "on something," to which Phillips replied, "yeah, I've been using drugs." Walker then asked Phillips what he was worried about. Phillips explained that he was worried about his girlfriend, Delia Sanchez. Phillips added that he had spent all of the couple's money, and that his girlfriend had nowhere to stay. Moreover, the rent was due the next day – Saturday. Thus, Delia was going to be put out on the street with nowhere to go and nothing to eat. Deputy Walker reassured Phillips, stating that he would take care of that. Phillips conceded that they really did not discuss any other crimes. Walker then let Phillips use his phone to call Delia.

7. Phillips testified that he had smoked more than $1,000 worth of crack cocaine the day before his arrest, which caused him to suffer feelings of paranoia. Morever, he was going through the early stages of Alzheimers, which caused him to have trouble remembering things.

8. Phillips further testified that, on the night of his arrest, Deputy Walker promised him a two year deal. According to Phillips, Walker advised him that, depending on his criminal record, he probably would receive no more than two years, maybe even probation. Phillips informed Walker, however, that he had an extensive record – about 16-17 convictions, including one federal. Deputy Green testified that no promises were made to Phillips.

9. Phillips told Walker that he would prefer to be in the *federal* system rather than the state system. He explained that he favored the system that afforded him the opportunity for earliest release. Paradoxically, however, Phillips testified that two years in federal custody meant that he had to do twenty months of time, whereas two years in the state system meant that he only had to do eight months. Phillips later testified that he did not want two years in the *federal* pen; instead, he wanted two years in state custody.

10. Phillips testified that he believed that a deputy in West Carroll Parish could guarantee the sentence that a federal prosecutor was going to impose possibly because Walker had spoken to someone.

11. Phillips also testified that he signed the waiver of rights form because Deputy Walker told him that he would take care of Delia. Phillips stated that the primary reason that he spoke with the officers was so his girlfriend would be safe and not stranded in Mississippi,

12. Phillips later testified that he was *not* really looking for a two year deal. Rather, his sole purpose was to let the officers know what was going on in West Carroll Parish.

13. Deputy Green testified that Phillips was at the CID building for two to three hours the night of his arrest, but was not questioned for that long. Deputy Walker was in charge of questioning. Furthermore, Phillips' statements were not recorded.[3] In contravention of usual (but not uniform) practice, no written report was prepared of the initial interview.

14. The booking records from the West Carroll Parish jail indicate that Phillips was booked into the facility at 3:20 a.m. on August 17, 2013, on a charge of illegal possession of stolen things. Phillips stated that he was placed in cell 9, without booking or fingerprinting. He found this odd. Phillips later learned that cell 9 was the intoxication cell. Deputy Green testified, however, that the jail did not have a separate holding cell for intoxicated detainees

15. Phillips stated that he remained awake in his cell all night long. The next morning, Walker and/or Green escorted him across the street to the CID building.

16. As the officers walked Phillips over to the CID building on Saturday, August 17, 2013, Phillips stated that Walker asked him whether he knew anything about a truck and a gooseneck trailer that had been taken. Phillips hesitated, because he really did not trust Walker, but he felt that he did not have a choice. He eventually replied, "yeah, I know something about a gooseneck trailer – I took it." He added that they took the trailer to Greenville and sold it, but cut up the truck. Walker asked Phillips whether he went into the building, and Phillips replied, "yeah, I went into the building . . . I took the money and I took the laptop computer. I took a – I guess a desk top computer. I took a cell phone." Walker told Phillips to keep the laptop, and not to say anything about it.

17. Phillips testified that the officers told him that they had just returned from Greenville, Mississippi where they had been looking for his girlfriend Delia. The officers wanted to help her out and give her some money so she would not be thrown out on the street. Deputy Walker stated that he recalled going to Greenville, Mississippi to meet Delia Sanchez at a motel.

18. The deputies introduced Phillips to Special Agent Bill Chesser, who advised him of his rights, and provided him with an FBI Advice of Rights Form that Phillips signed sub nom Mustafaa Kaleem on August 17, 2013, at 3:17 p.m. (Gov.'t Exh. 2). The form set forth the interviewee's *Miranda* rights, and included an acknowledgment that the interviewee was willing to answer questions without a lawyer present.

---

[3] However, Investigator Walker testified that there should have been a taped statement from the interview. No recorded statement was adduced at the hearing.

5

19. Phillips did not tell Chesser that he wanted a lawyer.  He also did not tell Chesser that he had been consuming drugs.  Phillips stated that the interview on Saturday lasted practically all day long.  He and his interlocutors traveled to Greenville, Mississippi, arriving around dusk.  They stayed in Greenville for about one and one-half to two hours.

20. Agent Chesser interviewed Phillips again on Monday, August 19, 2013.  Chesser revisited all of the topics that had been covered during the August 17 session because Phillips informed him that he had been under the influence of drugs.  At 10:43 a.m., Phillips signed another FBI Advice of Rights Form, sub nom Mustafaa Kaleem.  (Gov.'t Exh. 3).  He also signed an FBI Consent to Search Form witnessed by Bill Chesser, Chief Deputy Kenneth Green, and Investigator Garland Walker.  (Gov.'t Exh. 4).  The form confirmed Phillips' authorization for the agents to search his cell phone and his wallet.

21. On Tuesday, August 20, 2013, at 9:53 a.m., Phillips, sub nom Mustafaa Kaleem, signed another FBI Advice of Rights Form witnessed by Bill Chesser, Chief Deputy Kenneth Green, and Investigator Garland Walker.  (Gov.'t Exh. 5).

22. Also on Tuesday, August 20, 2013, Officer Allen Irby applied for, and obtained an arrest warrant for Phillips from the Fifth Judicial District Court for the Parish of West Carroll, State of Louisiana on a charge of illegal possession of stolen things.  The state court judge set bond at $50,000.

23. On an uncertain date, possibly as early as Tuesday, August 20, 2013, Phillips' girlfriend, Delia Sanchez, traveled to Oak Grove to visit Phillips.[4]  Sanchez testified that Phillips asked her to come visit him.  After that, an unknown officer called her and told her that it would be in her best interest if she did visit Phillips.  Sanchez conceded, however, that the person(s) who contacted her did not ask her to do anything for them.  Moreover, no one forced her to go to Oak Grove.  She also understood that Phillips wanted to see her.

24. Sanchez testified that her roommate brought her to Oak Grove from Greenville.  While at Oak Grove, Sanchez spoke with Sheriff Philley and told him that Phillips' incarceration had put her in a jam.  She had been thrown out of her motel, and was homeless.  Sheriff Philley asked her how much she needed to survive, and she told him that her roommate was charging $100 per week.  Philley said that he would take care of it, and gave her $100 cash for the rent, $25 for gas money for the trip to Oak Grove, and $20 for Sanchez.  Sanchez acknowledged receipt of the sums by signing for it in a book.[5]  She did not return

---

[4] According to the jail records, Sanchez's initial visit did not occur until October 1.

[5] Sheriff Philley confirmed that his office gave Sanchez some gas money, but he did not recall the sum.  He stated that his office did not routinely give money to inmates' significant others.  In fact, Philley did not recall any other instances.

to the jail for another week or two.[6]

25. Phillips testified that on "Tuesday," the officers told him that they were going to try and move Delia to a motel close to him. Phillips was concerned about Delia's safety in Mississippi because of the sensitive information he was providing. He stated that when Delia arrived in Oak Grove, the officers wanted her to go to a halfway house in Monroe, but Delia did not want to go because she did not know anyone. Delia told Phillips that she felt better about returning to Greenville. Phillips thought that Sheriff Philley was going to look out for Delia and him.

26. On Wednesday, August 21, 2013, at 8:58 a.m., Phillips, sub nom Mustafaa Kaleem, signed an FBI Advice of Rights Form witnessed by Bill Chesser, Chief Deputy Kenneth Green, Alan Irby, and Investigator Scott Culp, Morehouse Parish Sheriff's Office, and Investigator Garland Walker. (Gov.'t Exh. 6).

27. On Thursday, August 22, 2013, at 12:13 p.m., Phillips, sub nom Mustafaa Kaleem, signed an FBI Advice of Rights Form witnessed by Bill Chesser, Chief Deputy Kenneth Green, Investigator Garland Walker, and Sheriff Jerry Philley. (Gov.'t Exh. 7).

28. On Saturday, August 24, 2013, at 8:17 a.m., Phillips, sub nom Mustafaa Kaleem, signed an FBI Advice of Rights Form witnessed by Bill Chesser, Chief Deputy Kenneth Green, Allen Irby, and Investigator Garland Walker. (Gov.'t Exh. 8).

29. On Monday, August 26, 2013, at 8:52 a.m., Phillips, sub nom Mustafaa Kaleem, signed an FBI Advice of Rights Form witnessed by Bill Chesser and Chief Deputy Kenneth Green. (Gov.'t Exh. 9). This was the last interview with Phillips.

30. Deputy Green testified that no questioning took place without Phillips' first signing the consent forms. Each time, Agent Chesser also reviewed the questions on the form with Phillips.

31. For each interview, either the jailer or Deputy Walker would escort Phillips over to the CID Building. Most of the time, the interviews lasted for the "biggest part of the day." Phillips stated that he gave statements to Chesser each time that he was interviewed.

32. Deputy Green testified that sometimes they would leave the CID building because Phillips would point out locations around the parish where he stole various items. On one occasion, they traveled to Greenville, Mississippi to view various locations there. The purpose of the trips was to verify the information provided by Phillips. The investigators

---

[6] The next time that Sanchez went to Oak Grove, she ran into Garland Walker. She told him that she needed gas money, and that the officers had said that they would take care of her. Walker reached into his wallet and gave her $5. She never received any more money after that.

used Phillips' information to match him with 37 police reports.[7]

33. Green stated that the atmosphere during the questioning was lighthearted and loose, with laughter and joking. Phillips did not exhibit any signs of stress at all. The investigators provided Phillips with the same food that they ate, and did not charge him for these meals. They also permitted Phillips to call his girlfriend because he was concerned for her safety. Green and Walker denied providing any additional or special benefits to Phillips.[8]

34. On August 26, 2013, at 2:32 p.m. and/or August 27, 2013, at 7:32 a.m. a state court judge advised Phillips of the charge against him and appointed counsel, Ms. Caroline Hemphill, to represent him. (Gov.'t Exh. 10). Although the parish court is located above the jail, it appears that the court notified Phillips via telephone.[9]

35. Danny Frazier, Warden, West Carroll Parish Sheriff's Department, testified that when the judge is ready for the initial appearance, he or she would call the jail and ask to speak to the inmate. The warden then would retrieve the inmate and place him on the phone with the judge.[10]

36. Allen Irby testified that initially the officers detained Phillips pursuant to a warrant from another parish. Thus, from August 16-20, the officers held Phillips on that warrant. On August 20, Irby swore out an arrest warrant for the possession of stolen goods charge. Because Phillips was disclosing information to Green and Chesser, Irby conceded that the officers were in no hurry to process his paperwork.

37. Irby also testified before the federal grand jury in this case. He was not aware of any statements made by Phillips in this investigation that did not result in questioning from S.A. Chesser.

38. Phillips and several of his former cell mates testified that Deputy Walker visited Phillips on several occasions.[11] These alleged contacts, however, occurred after Phillips had been

---

[7] The government did not adduce any details regarding the statements provided by Phillips or the dates that he made them.

[8] Similarly, Deputy Irby stated that Phillips cooperated of his own free will. Irby was not aware of any duress that Phillips may have experienced.

[9] Ms. Hemphill testified that this was the customary practice of the court.

[10] No testimony was elicited to establish how the judge is supposed to learn that a person is in custody and in need of an initial appearance.

[11] Phillips testified that Walker went to the jail about 10-12 times.

appointed counsel.  Phillips conceded as much at the hearing.

## Law and Analysis

Defendant contends that law enforcement officers violated Articles 230 and 230.1 of the Louisiana Code of Criminal Procedure by failing to provide him with counsel and to present him before a judge within 72 hours after his arrest.  He argues that these omissions had a coercive effect on his ability to withstand the officers' questioning.  Defendant further argues, albeit no more than perfunctorily, that any statements he made were the product of impermissible inducements and threats, and therefore, neither free, nor voluntary.  Moreover, defendant's drug-induced intoxication negated the voluntariness of any alleged consent.

He concludes that any incriminating statements, and any evidence resulting therefrom, must be suppressed because they are the unlawful issue of the government's transgression of his Fifth and Sixth Amendment rights.  The court will address the arguments in turn.

**I.    Right to Counsel and Delay in Presentment**

Louisiana law provides that an arrestee "has, from the moment of his arrest, a right to procure and confer with counsel and to use a telephone or send a messenger for the purpose of communicating with his friends or with counsel." La. Code Crim. Pro. Art. 230.  The Louisiana Supreme Court has recognized, however, that apart from situations where a defendant actually invoked his right to counsel, he may validly waive his right counsel so long as it is knowing, intelligent, and voluntary.  *State v. Carter*, 664 So. 2d 367, 383 (La. 1995).  Here, Phillips validly waived his right to counsel.  *See* discussion, *infra*.  Moreover, the officers permitted him to telephone his girlfriend the night of his arrest.  While defendant may not have had funds to retain counsel, he should have had the names of any number of criminal defense attorneys (given his

extensive criminal history) that he could have contacted for immediate, short-term assistance, if desired.

Louisiana law also provides that a law enforcement officer having custody of an arrested person shall promptly bring him, "and in any case within seventy-two hours from the time of the arrest, before a judge for the purpose of appointment of counsel." La. Code Crim. Pro. Art. 230.1. Weekends and legal holidays, however, are not included in the calculation of the 72 hour period. *Id*. The remedy for non-compliance with the foregoing presentment requirement is release from custody. *Id*. Moreover, the "failure of the sheriff or law enforcement officer to comply with the requirements herein shall have no effect whatsoever upon the validity of the proceedings thereafter against the defendant." *Id*.

The Louisiana Supreme Court has held that there is no violation of Article 230.1 so long as the delay did not exceed the statutory maximum, i.e., 72 hours. *State v. Manning*, 885 So. 2d 1044, 1075 (La. 2004). In addition, the court confirmed that even when the presentment delay exceeds 72 hours, the remedy is pretrial release, not suppression of evidence. *Id*.

In this case, after excluding the intervening weekend, Article 230.1 obliged the officers to present Phillips before a judge by the evening of Wednesday, August 21. By that time, however, Phillips already had been questioned on four occasions by Agent Chesser. Thus, there is no evidence of a causal connection between any unlawful delay that commenced on Thursday, August 22 and Phillips' prior statements. *See United States v. Martin*, 431 F.3d 846, 849 (5th Cir. 2005) (there must be causal connection between statements and illegality of detention); *United States v. Mitchell*, 322 U.S. 65, 66-67, 64 S. Ct. 896, 896-97 (1944) (a subsequent illegal detention does not render inadmissible a defendant's prior confessions). While Phillips

proceeded to have three more sessions with Agent Chesser, it is not known whether the information provided by Phillips after August 21 was materially different or merely cumulative of his earlier statements. In any event, the remedy for an Article 230.1 violation is pretrial release, not suppression. *Manning, supra*.

The foregoing analysis notwithstanding, detention of a suspect "by state officers on a proper state charge *but in violation of a state requirement that [he] be taken before a magistrate . . . does not . . .* require suppression in federal court of the fruits of interrogation by federal officers as to an unrelated offense." *Barnett v. United States*, 384 F.2d 848, 856 (5th Cir. 1967) (emphasis added). Moreover, although Rule 5 of the Federal Rules of Criminal Procedure codified the common law rule requiring prompt presentment of an arrestee before a magistrate judge, it does not apply until a person is arrested or detained for a *federal* crime. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358, 114 S. Ct. 1599, 1604 (1994).[12]

Thus, in a tangible way, Phillips finds himself trapped in the no man's land between the state and federal systems. To be sure, there are cases where federal and state law enforcement officers have conspired to abuse the gap between the two conventions. *See e.g., Anderson v.*

---

[12] Thus, "federal agents properly may interrogate subjects held in state custody although the subjects are not first taken before a federal [magistrate judge] in compliance with Rule 5(a) (or before a state magistrate, *even when required by state law*)." *Barnett, supra* (emphasis added).

In *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608 (1943) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356 (1957), the Supreme Court established a remedy for violations of Rule 5(a)'s prompt-presentment requirement: the inadmissibility of any confessions obtained during a period of unreasonable delay. *Corley v. United States*, 556 U.S. 303, 309, 129 S. Ct. 1558, 1563 (2009). Nevertheless, an arrestee's right to prompt presentment before a magistrate judge is derived from common law, not the Constitution. *See Barnett, supra*; *United States v. Boche-Perez*, 755 F.3d 327 (5th Cir. 2014) (noting the common-law origin of the "prompt presentment" requirement).

*United States*, 318 U.S. 350, 63 S. Ct. 599 (1943). As a result, the federal courts have extended Rule 5(a)'s prompt presentment requirement to a federal defendant being held in state custody on state charges when the defendant is able to establish unlawful collusion between the state and federal authorities to thwart his timely presentment before a judge. *United States v. Atkinson*, 450 F.2d 835, 841 (5th Cir. 1971) (citations omitted).

Stated differently, "where federal interrogation of subjects in state custody is pursuant to cooperative activity of the state and federal officers constituting a working relationship . . . the purported state custody is to be deemed federal custody and the reasonableness of the delay measured accordingly." *Barnett, supra* (internal quotation marks omitted). Generally, the issue is whether the cooperation amounts to "collaboration to achieve an unlawful end." *Id*. (citations omitted). A valid delay requires a legitimate state investigation for a suspected state offense. *Id*. Another important consideration is "whether or not state officials will proceed with further action on the state charge independent of the outcome of the federal investigation." *Id*. The defendant retains the burden to prove an improper "working arrangement" between the federal and state authorities. *Atkinson, supra*.

Here, Phillips has not offered any evidence to establish improper collusion between Agent Chesser and local law enforcement. By all accounts, the state authorities charged and prosecuted Phillips for violations of state law. In fact, he still was in state custody almost one year after his arrest when this court issued a writ for his initial appearance on the federal charges. Furthermore, there is no evidence that the local law enforcement officers delayed presentment to permit interrogation at Agent Chesser's behest. In addition, given the seemingly lax procedures in effect in West Carroll Parish, combined with the relatively toothless state law remedy for

delayed presentment, defendant has not rebutted the equally likely conclusion that delay in this case was standard operating procedure for the local authorities, rather than the product of federal-state collusion.[13] Accordingly, defendant has not demonstrated that he was deprived of his right to timely presentment on the federal charges at issue. *See United States v. Whitmore*, 386 F. App'x 464, 470-71 (5th Cir. 2010).[14]

The government further argues that even if there was a Rule 5(a) violation in this case, it does not warrant suppression because Phillips' *Miranda* waiver also constituted a waiver of his *McNabb-Mallory* rights. In *United States v. Boche-Perez*, the Fifth Circuit panel declined to address whether such a rule existed in this circuit, but cited Justice Alito's dissent in *Corley v. United States*, 556 U.S. 303, 129 S. Ct. 1558 (2009), which collected cases recognizing the principle. *Boche-Perez*, 755 F.3d at 335, n2. However, one of the cases cited by Justice Alito included *O'Neal v. United States*, a decision in which the Fifth Circuit found no cognizable harm stemming from delayed presentment where the defendant had received *Miranda* warnings and validly waived them. *O'Neal v. United States*, 411 F.2d 131, 136-137 (5th Cir. 1969). Pursuant to *O'Neal*, any alleged Rule 5(a) violation in this case does not warrant suppression. *See*

---

[13] Phillips did not assert a Fourth Amendment violation for the officers' failure to convene a probable cause determination within 48 hours of his arrest. *See Alvarez-Sanchez, supra*. In any event, the deputies purportedly were holding him on an arrest warrant from another parish which served as a judicial determination of probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975).

[14] Insofar as defendant maintains that he was interviewed after he was appointed counsel on the state charge in violation of his Sixth Amendment rights, the court notes that was no evidence of any substantive conversations between law enforcement officers and Phillips after his August 26 initial appearance in state court. Moreover, because the Sixth Amendment right to counsel is offense-specific, it did not attach to his federal charge until well after the events at issue. *United States v. Burgest*, 519 F.3d 1307, 1310 (11th Cir. 2008) (citing *inter alia, United States v. Avants*, 278 F.3d 510 (5th Cir.2002)).

discussion, *infra*.

## II.     Miranda and the Voluntariness of the Statements

The admissibility of pre-indictment confessions is regulated by both the Fifth Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause"). The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted). The central principle established by *Miranda* is that if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

In addition, a criminal defendant is "deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*, 404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624 (1972) (citations and internal quotation marks omitted). The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*. The sole purpose of the hearing is to determine whether the confession was coerced. *Id*.

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir.1996). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted).

At one time, the Supreme Court held that a confession may not be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *United States v. Munoz*, 979 F.2d 1533 (5th Cir. 1992) (citing *Bram v. United States,* 168 U.S. 532, 542-43 (1897)). The rule now is less rigid. Courts are called upon to determine whether an officer's comments cross the line between expressions of sympathy and kindness on the one hand versus

promises of leniency on the other. *Munoz, supra* (citations omitted). Courts also need to distinguish between an improper promise and a permissible prediction about future events that is beyond the parties' control or regarded as inevitable. *Id.* Even a promise of leniency, however, will not render a confession involuntary if the defendant's criminal background is such that he should have known the consequences of his statements. *See United States v. Santiago*, 410 F.3d 193, 202-03 (5th Cir. 2005).

Furthermore, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly, supra*. Equally, "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion." *Id*. Thus, the voluntariness of a Miranda waiver and resulting confession depend upon the absence of police overreaching, not on "free choice." *Id*.

The Fifth Circuit remarked that after *Connelly*, the relevant test no longer focuses on the defendant's free will. *United States v. Raymer*, 876 F.2d 383, 386 -387 (5th Cir. 1989) (citations omitted). "Instead, the focus is on the presence or absence of police coercion." *Id*. Although a defendant's mental condition still figures into the voluntariness calculus, there must be an element of official overreaching to render a confession involuntary under the Constitution. *Id*. In other words, the police must exploit the defendant's mental condition. *See Raymer, supra*. Along these lines, a confession may be involuntary if the defendant is so intoxicated by alcohol or other drugs that the confession is not rationally and freely given. *United States v. Blake*, 481 F. App'x 961, 962 (5th Cir. 2012). However, official coercion is still required. *Id*.

Applying the foregoing considerations here, the undersigned finds that the officers

advised Phillips of his *Miranda* rights on the night that he was arrested and each day thereafter before each session with Agent Chesser.[15] The evidence is uniform that the questioning occurred in a cordial, even lighthearted atmosphere. Phillips' interlocutors provided him with the same food and drink that they consumed. Moreover, they even permitted him to call his girlfriend. *See United States v. Cantu-Ramirez*, 669 F.3d 619, 627 (5th Cir. 2012) (defendant provided with food and drink and permitted to make telephone calls); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1138 (5th Cir. 1988) (plying defendant with milk, pie, hamburger, and fries was not objectionable).

The court does not infer any impermissible motive behind the Sheriff's transmission of subsistence funds to Ms. Sanchez. Phillips had conveyed his concerns to the deputies regarding Ms. Sanchez's well-being and safety – given his prior squandering of the couple's rent money, as well as the sensitive information he apparently was divulging as to his accomplices. According to Phillips, the deputies initially wanted Ms. Sanchez to go stay in a halfway house in Monroe. They only agreed to provide her subsistence funds after she stated her intention to return to Greenville. In any event, by the time Ms. Sanchez arrived, Phillips already had volunteered at least two days' worth of information.

Insofar as Deputy Walker attempted to establish a rapport with Phillips on the basis that they both were African-American, there is nothing wrong with efforts to create favorable environment for confession. *See Hawkins, supra* (nothing wrong with sending in a black officer

---

[15] In fact, "[o]nce a suspect has waived his rights, the police are free to continue to question him. There is no requirement that a suspect be continually reminded of his *Miranda* rights following a valid waiver." *Soffar v. Cockrell*, 300 F.3d 588, 593 (5th Cir. 2002) (citations omitted).

to play to defendant's professed dislike for "honkies"). Furthermore, the court does not credit Phillips' testimony that Walker promised him a two year deal. Phillips' testimony was not consistent, and he appeared confused at times. By his own admission, he was suffering from early onset Alzheimers. If anything, Walker may have promised Phillips a two year deal on the *state* charge(s). If so, there is no evidence that he failed to keep that promise. In any event, someone with Phillips' impressive criminal history that included a federal conviction, could not reasonably have believed that Walker had authority to make such a promise.

Finally, defendant has not established that he was incapable of validly waiving his *Miranda* rights on Saturday, August 17 because of alleged cocaine use some two days earlier. There was no testimony to establish what effect a two-day old cocaine binge would have on an individual. In addition, the alleged cocaine use apparently did not materially impair Phillips because he was able to not only drive a tractor trailer, but also recall specific conversations from the night of his arrest. If anything, the cocaine buttressed Phillips' efforts to resist the officers' questioning because, according to Phillips, it made him paranoid and untrusting. In any event, Phillips again received and validly waived his *Miranda* rights on Monday, August 19.

Upon consideration of the totality of the circumstances,[16] the undersigned finds that the government has demonstrated by a preponderance of the evidence the voluntariness of Phillips' incriminating statement(s) and *Miranda* waiver.

## Conclusion

---

[16] To the extent that the presentment delay should be considered in the voluntariness analysis, it does not change the outcome. The court so finds because of Phillips' professed willingness to talk to the FBI beginning on the night that he was arrested, plus the fact that he started to provide incriminating statements less than one full day after his arrest on a weekend (i.e. during a period when a magistrate judge was not usually available).

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 55] filed by defendant, James Phillips be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have fourteen(14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. **However, due to the rapidly approaching trial date, Objections to this Report and Recommendation are due no later than Tuesday May 12, 2015. Replies to objections are due no later than Friday, May 15, 2015.** Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 30th day of April 2015.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE